**FILED - GR**

October 23, 2014 4:32 PM
TRACEY CORDES, CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:_ mkc /_____   SCANNED BY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

UNITED STATES OF AMERICA,
ex rel. William Q. Tingley III,

　　　　　Plaintiff,

　　v.

THE PNC FINANCIAL SERVICES
GROUP INC., a Pennsylvania corporation,

　　　　　Defendants.

Case No.:

Hon.:

**1:14-cv-1097**

**Janet T. Neff**
**U.S. District Judge**

---

Sean P. Fitzgerald (P60654)
KREIS, ENDERLE, HUDGINS &
BORSOS, P.C.
Attorneys for Plaintiff
40 Pearl Street NW, 5th Floor
Grand Rapids, MI 49503
616-254-8400; Fax: 616-254-8410

---

## COMPLAINT

*NOTE: This complaint is filed under seal pursuant to 31 U.S.C. Section 3730(b)(2).*

## PARTIES AND JURISDICTION

1. This action is brought under the federal False Claims Act, 31 U.S.C. Sections 3729 et seq. by the Relator, William Q. Tingley III, on his own behalf and that of the United States of America. It seeks to recover treble damages and civil penalties arising from submission of false claims by Defendant PNC Financial Services Group Inc. to the U.S. Treasury Department to receive funds from the Capital Purchase Program of the Troubled Assets Relief Program.

2. To obtain these funds from the United States the Defendant made knowingly false representations relating to environmental liabilities it acquired from its predecessor, National City Corporation.

3. This action is solely based upon information that the Relator possesses from his eyewitness and personal knowledge of the false claims and the violations of state and federal environmental statutes. This information supports the existence of knowingly false claims to obtain funds from the United States in violation of 31 U.S.C. Sections 3729(a)(1)(A) and (B).

4. Furthermore, the Relator is an original source of this information under 31 U.S.C. Section

3730(e)(4)(B). He has provided this information to the U.S. Justice Department as required under Section 3730(b)(2).

5. The United States of America is named as the Plaintiff pursuant to 31 U.S.C. Section 3730(b)(1) and because the U.S. Treasury Department awarded funds to the Defendant from the Capital Purchase Program.

6. Relator William Q. Tingley III ("Tingley") is a citizen of the United States. He resides at 225 Prospect Avenue N.E., Grand Rapids, Michigan 49503.

7. Defendant PNC Financial Services Group Inc. ("PNC") is a Pennsylvania banking corporation. Its principal office is located at One PNC Plaza, 249 Fifth Avenue, Pittsburgh, Pennsylvania 15222.

8. Before receiving funds from the Capital Purchase Program, PNC acquired National City Corporation and National City Community Development Corporation (collectively, "National City"). It is the successor of National City.

9. Fifth Third Bank ("Fifth Third") is a Michigan banking corporation. Its principal office is located at 111 Lyon Street N.W., Grand Rapids, Michigan. Fifth Third acquired Old Kent Financial Corporation and Old Kent Bank (collectively, "Old Kent") in April 2002. It is the successor of Old Kent.

10. The transactions and events underlying the Defendant's false claims against the United States were initiated by National City and Old Kent, with Old Kent acting as National City's agent. Before the Defendant made the false claims, PNC had acquired National City and Fifth Third had acquired Old Kent. All references to PNC include National City. All references to Fifth Third include Old Kent.

11. This Court has subject matter jurisdiction pursuant to:

   a. 31 U.S.C. Section 3732(a), which specifically confers jurisdiction for this False Claims Act case;

   b. 28 U.S.C. Section 1331, which confers jurisdiction for federal questions arising under the laws of the United States; and

   c. 28 U.S.C. Section 1345, because the United States is a plaintiff.

12. Venue and personal jurisdiction are proper in the Western District of Michigan in which the Relator resides, the Defendant transacts business, and most of the events alleged herein occurred.

## BACKGROUND

13. The Capital Purchase Program ("CPP") is administered by the Office of Financial Stability of the U.S. Treasury Department, as authorized under the Emergency Economic Stability Act of

2008.

14. The purpose of the CPP was to provide capital from the Treasury Department, in exchange for preferred stock, to certain financial institutions which were financially sound except for a reduction in net worth because of a general decline in the value of assets arising from temporary illiquidity in the markets for those assets.

15. The CPP was not intended to address reductions in a financial institution's net worth because of liabilities arising from violations of state and federal environmental statutes.

16. On December 31, 2008, PNC signed a CPP agreement with the Treasury Department. This agreement contained specific disclosures by PNC about liabilities and other conditions that may have a materially adverse effect on it. Under this agreement PNC received $7.5 billion in CPP funds in exchange for preferred stock issued to the Treasury Department. [**Exhibit A**, CPP Agreement.]

17. In Paragraph 2.2(q) of the CPP Agreement, PNC represented that there were no proceedings or liabilities, or threat of such, against it or its subsidiaries relating to the release of hazardous substances that may have a materially adverse effect on it.

18. PNC's representation was false, and PNC knew it was false at the time it made it.

## Defendant's Environmental Liabilities

19. 940 Monroe L.L.C. ("940 Monroe") was a Michigan limited liability company that owned, managed, and redeveloped an old furniture factory as a residential-commercial complex, located at 940 Monroe Avenue N.W., Grand Rapids, Michigan 49503. The redevelopment project site has been known at various times as the B&G Building, the Berkey & Gay Building, and the Boardwalk (referred to herein as the "Boardwalk").

20. PNC was an owner of 940 Monroe. Fifth Third was PNC's agent representing its interests in 940 Monroe and the Boardwalk property. PNC is liable for the acts and omissions Fifth Third made on its behalf. [**Exhibit B**, notice of agency agreement.]

21. As a condition of purchasing an interest in 940 Monroe, PNC required the other owners to warrant that the Boardwalk property was free of any environmental contamination by hazardous substances. [**Exhibit C**, 940 Monroe operating agreement.]

22. PNC knew that the Boardwalk's soil had been severely contaminated with hazardous substances and had to be removed from the site to meet its demand.

23. On December 17, 1999, 940 Monroe received from its environmental consultant soil test results for the Boardwalk property which established that the site was contaminated with several hazardous substances at levels harmful to human life and health. [**Exhibit D**, soil test result tables.]

24. On February 23, 2000, 940 Monroe disclosed to PNC and Fifth Third an environmental

3

assessment which stated that the Boardwalk property was a "facility" contaminated by hazardous substances under state law and subject to regulation to prevent releases of contaminated material into the environment. [**Exhibit E**, Fifth Third file copy of disclosure.]

25. On March 16, 2000, 940 Monroe disclosed to PNC and Fifth Third a due care plan which stated that all of the Boardwalk property's soil was hazardous waste and gave them notice of the controls that had to be implemented to prevent its release into the environment.  [**Exhibit F**, Fifth Third file copy of due care plan.]

26. These controls required the owners of 940 Monroe to keep all soil in its original place, to not release soil off-site, to cap all exposed soil, to notify contractors in writing of these controls, and to document compliance with these controls.

27. From April 2000 through November 2000, 940 Monroe's contractors dumped 25,000 tons of Boardwalk soil off-site without imposing any of these controls.  All of this soil was released into the environment in violation of federal and state law.

28. Because PNC required the removal of the contaminated soil as a condition of purchasing an interest in 940 Monroe, PNC incurred strict liability for releases of the soil caused by its removal as an "arranger" under 42 U.S.C. Section 9607(a)(3) and MCL 324.20126(d).

### Evidence of Soil Removal

29. The Relator's workplace is next-door to the Boardwalk property.  He was an eyewitness to the soil removal activities.  He photographed the removal.  He kept videotapes from his workplace's security system that recorded the removal.  The Relator has recorded at least 800 transports of the Boardwalk's soil to off-site locations by 940 Monroe's contractors. [**Exhibit G**, photographs and video stills of soil removal activity.]

30. On October 17, 2000, James Czanko, 940 Monroe project manager, told Bonnie White of the Michigan Department of Environmental Quality ("MDEQ") that the contractors dumped contaminated soil from the Boardwalk property at a landfill in Sparta, Michigan.  [**Exhibit H**, White's contact log.]

31. Daniel Schimmel, the general manager of one of the contractors, told MDEQ officials Gerard Heyt on November 2, 2000 and Bonnie White on November 8, 2000, that his company had dumped Boardwalk soil at a defunct water filtration plant. [**Exhibit H** and **Exhibit I**, White's activity report.]

32. On December 6, 2000, Gary Schenk, an attorney for one of the contractors, wrote White a letter acknowledging the dumping of Boardwalk soil at the filtration plant.  [**Exhibit J**, Schenk's letter.]

33. On March 8, 2001, Fifth Third, on its own behalf and as an agent of PNC, filed a mortgage with the Kent County Register of Deeds that publicly warranted that no hazardous substances contaminated the Boardwalk property and that no environmental laws had been violated involving that property.  PNC subsequently filed other mortgages warranting the same.

4

[**Exhibit K**, Boardwalk mortgage, Paragraph 13.]

34. On March 9, 2001, PNC, Fifth Third, and the other co-owners of 940 Monroe signed an operating agreement warranting, in conformity with the mortgage, that no hazardous substances contaminated the Boardwalk property. [**Exhibit C**, Sections 9.5(c), 9.5(e), 9.5(v), and 10.1.]

35. On April 25, 2001, Thomas Beckering, the manager and one of the co-owners of 940 Monroe, stated in a deposition that soil had been removed from the Boardwalk property because the "bank" required it. [**Exhibit L**, Beckering's deposition.]

36. Robert Hayes is the former MDEQ chief hydrologist and a forensic geologist. He examined the Relator's evidence and MDEQ soil tests of samples taken from the filtration plant. On January 6, 2005, he submitted an affidavit to the Kent County Circuit Court that 940 Monroe's contractors had removed 25,000 tons of soil from the Boardwalk property in violation of state law. [**Exhibit M**, Hayes's affidavit.]

37. On May 1, 2006, PNC filed a mortgage with the Kent County Register of Deeds that publicly warranted that no hazardous substances contaminated the Boardwalk property and that no environmental laws had been violated involving that property. [**Exhibit N**, Boardwalk mortgage, Paragraph 24.]

38. On May 17, 2012, John Sperla, an attorney for one of the contractors, admitted in a court hearing that the Relator's allegations of off-site removal were factually accurate. [**Exhibit O**, court transcript, Page 33, Lines 6-11.]

39. Judge James Redford of the Kent County Circuit Court stated at the same hearing that PNC's attorney, Fifth Third's attorney, the contractors' attorneys, and he all knew that "tens of thousands of cubic yards of soil was removed" from the Boardwalk property. [**Exhibit O**, Page 42, Lines 22-25.]

40. Presently there is no genuine controversy that 25,000 tons of Boardwalk soil were dumped off-site by 940 Monroe's contractors during April to November 2000.

**Defendant's Concealment of Soil Removal from Authorities**

41. PNC had knowledge of the removal of Boardwalk soil to off-site locations. On March 9, 2001, it signed the 940 Monroe operating agreement which warranted that the soil had been removed. On December 19, 2002, PNC's agent Fifth Third and 940 Monroe received by order of the U.S. District Court the Relator's photographic and videotape evidence of the removal.

42. To the extent that PNC did not have direct knowledge of the soil removal, it had knowledge through its agent Fifth Third and 940 Monroe. It otherwise cultivated deliberate ignorance of the facts by not verifying the environmental condition of the Boardwalk property before, during, and after its redevelopment by 940 Monroe through the bank's normal procedures.

43. PNC is liable for the off-site releases of Boardwalk soil because it required its removal as a condition of purchasing an interest in 940 Monroe. PNC was either deliberate or willfully reckless in permitting the releases because it withheld any action to enforce the due care plan, to report the releases to the proper authorities, and to remediate the releases.

44. To conceal its liability for the releases, PNC by acts of commission and omission, directly, through its agent Fifth Third, and through its ownership of 940 Monroe, concealed the releases from state and federal authorities including the Treasury Department.

45. Part of PNC's liability are civil penalties under state and federal law, including but not limited to a maximum fine of $37,500 for each release of Boardwalk soil for every day the release is unreported and unremediated. Under U.S. Environmental Protection Agency enforcement guidelines, PNC is liable for the maximum penalty because it deliberately or recklessly permitted the releases and it did not cooperate with authorities in reporting or remediation them. Presently, PNC's liability for civil penalties is as much as $150 billion.

46. PNC's liability was materially adverse to its financial condition at the time it signed the CPP Agreement with the Treasury Department.

47. As part of the MDEQ's investigation of the Boardwalk property in November 2000, White directed 940 Monroe to account for the disposition of all of the site's soil. In response, on January 2, 2001, 940 Monroe submitted to White a report claiming to do so ("Marshall Report"). Contrary to the photographic and videotape evidence of the 800 transports of Boardwalk soil to off-site locations, the report claimed that all of the Boardwalk soil remained on-site. [**Exhibit P**, Marshall Report.]

48. On February 22, 2001, Fifth Third, as PNC's agent, confirmed with White that she accepted the Marshall Report and closed the MDEQ's investigation in favor of 940 Monroe. [**Exhibit Q**, White's note of phone call from Fifth Third's attorney.]

49. On March 9, 2001, PNC purchased its interest in 940 Monroe with the knowledge that the MDEQ had closed the Boardwalk investigation based upon 940 Monroe's representation that all Boardwalk soil remained on-site.

50. On February 16, 2003, PNC, through 940 Monroe, represented to the U.S. District Court in the proceedings of an environmental lawsuit to remedy the Boardwalk releases that the MDEQ's finding the all of the Boardwalk soil remained on-site was correct. Based upon this, the court dismissed the lawsuit.

51. On May 16, 2006, PNC, through the successor of 940 Monroe, submitted to the MDEQ a second environmental assessment which stated that all Boardwalk soil remained on-site. [**Exhibit R**, disclosure to MDEQ.]

52. On December 31, 2008, PNC did not disclose to the Treasury Department in Paragraph 2.2(q) of the CPP Agreement the removal of Boardwalk soil to off-site locations and its liability for that removal.

53. At the same time PNC, either directly or through 940 Monroe, concealed the removal of Boardwalk soil from the MDEQ and the U.S. District Court, it represented in transactions of Boardwalk property that all the contaminated soil had been removed.  Without regard to the truth, PNC made whatever representation about the soil's disposition that was to its financial advantage at the time.

## COUNT I: FALSE CLAIM

54. The preceding allegations are re-alleged and incorporated by reference.

55. In Paragraph 2.2(q) of the CPP Agreement, PNC represented that there were no proceedings or liabilities, or threat of such, against it or its subsidiaries relating to the release of contaminated soil from the Boardwalk property that may be a materially adverse effect on it.

56. This representation was false when PNC made it, because the liabilities relating to the releases of Boardwalk soil had already been incurred as an arranger through its purchase of an ownership interest in 940 Monroe.

57. PNC knew the representation was false when made, because it had knowledge of the Boardwalk soil's contamination, the controls required to prevent the soil's release, the releases of the soil, its requirement to remove the soil as a condition of its purchase of 940 Monroe, and its cooperation with 940 Monroe in maintaining a false record with the MDEQ and the U.S. District Court that all the Boardwalk soil remained on-site.

58. PNC, as a publicly-held  company, never reported these liabilities, in any manner on its Form 10-Q quarterly reports, Form 10-K annual reports, and Form 8-K "changed conditions" reports to the Securities and Exchange Commission ("SEC"), from 2001 to the present, in violation of 15 U.S.C. Sections 78m(a) and (b)13.

59. PNC's senior executive officers certified these reports in violation of 15 U.S.C. Section 7421(a)14.

60. PNC's liabilities relating to the releases of Boardwalk soil were a materially adverse effect on it when it signed the CPP Agreement with the Treasury Department.

61. PNC made the false representation in the CPP Agreement to conceal from the Treasury Department the materially adverse effect of these liabilities on its financial condition in violation of 31 U.S.C. Section 3729(a)(1)(A).

62. PNC's failure to report the releases to the MDEQ supported its false representation in the CPP Agreement in violation of 31 U.S.C. Section 3729(a)(1)(B).

63. PNC's failure to disclose materially adverse environmental liabilities in its SEC reports and certifications supported its false representation in the CPP Agreement in violation of 31 U.S.C. Section 3729(a)(1)(B).

64. PNC intended that the Treasury Department rely upon its representations in the CPP Agreement and its lack of disclosures to the MDEQ and SEC as true and accurate to receive CPP funds.

65. The Treasury Department relied upon these representations to transfer $7.5 billion in CPP funds to PNC.

66. The United States of America has suffered actual damages because of these knowingly false representations.

## COUNT II: FALSE CLAIM CONSPIRACY

67. The preceding allegations are re-alleged and incorporated by reference.

68. PNC acted in concert with Fifth Third, 940 Monroe, and 940 Monroe's contractors to make and maintain knowingly false records with the MDEQ, the U.S. District Court, the SEC, and the Treasury Department to conceal its liabilities relating to the releases of Boardwalk soil.

69. These records supported the knowingly false representations PNC made in its CPP Agreement with the Treasury Department in violation of 31 U.S.C. Section 3729(a)(1)(B).

70. PNC's conspiracy with Fifth Third, 940 Monroe, and 940 Monroe's contractors to make and maintain these false records is in violation of 31 U.S.C. Section 3729(a)(1)(C).

71. The United States of America has suffered actual damages because of PNC's conspiracy with Fifth Third, 940 Monroe, and 940 Monroe's contractors.

## REQUEST FOR RELIEF

WHEREFORE, the Relator requests the following relief on his own behalf and that of the United States of America:

1. Judgment against the Defendant in an amount equal to the three times the damages suffered by the United States of America because of its false claim, plus a civil penalty of $11,000 for each violation of 31 U.S.C. Section 3729;

2. An award to the Relator of the maximum amount allowed for the Relator's statutory share of the amount recovered by the United States of America in this action;

3. Reimbursement of the Relator's attorney fees, costs, and expenses incurred from the action; and

4. All other remedy and relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiff demands that this matter be tried by jury.


DATE: October 23, 2014                    Respectfully submitted,

                                          KREIS, ENDERLE, HUDGINS &
                                          BORSOS, P.C.


                                          By: _____
                                          Sean P. Fitzgerald (P60654)
                                          Attorneys for Plaintiff
                                          40 Pearl Street NW, 5th Floor
                                          Grand Rapids, MI 49503