## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

———————

**UNITED STATES OF AMERICA,**
ex rel. William Q. Tingley III,

      Plaintiff,

  v.

**THE PNC FINANCIAL SERVICES
GROUP, INC.,** a Pennsylvania corporation,
and **FIFTH THIRD BANCORP,** an Ohio
banking corporation,

      Defendants.

Case No.: 1:14-cv-1097

Hon.: Janet T. Neff

**FILED UNDER SEAL**

---

Sean P. Fitzgerald (P60654)
KREIS, ENDERLE, HUDGINS &
BORSOS, P.C.
Attorneys for Plaintiff
40 Pearl Street NW, 5th Floor
Grand Rapids, MI 49503
616-254-8400; Fax: 616-254-8410

---

## FIRST AMENDED COMPLAINT

*NOTE: This complaint is filed under seal pursuant to 31 U.S.C. Section 3730(b)(2).*

### INTRODUCTION

1. This action is brought under the federal False Claims Act, 31 U.S.C. Sections 3729 et seq. by the Relator, William Q. Tingley III, on his own behalf and that of the United States of America. It seeks to recover treble damages and civil penalties arising from submission of false claims by Defendants Fifth Third Bancorp and PNC Financial Services Group Inc., in concert with Pioneer General Contractors Inc. and Dykema Excavators Inc., to the U.S. Treasury Department to receive funds from the Capital Purchase Program of the Troubled Assets Relief Program.

2. To obtain these funds from the United States the Defendants made knowingly false representations and misleading omissions relating to environmental and other materially adverse liabilities from their participation in a brownfield redevelopment project known as "The Boardwalk" in Grand Rapids, Michigan.

3. These materially adverse liabilities arise from both past and continuing violations of state and

federal statutes by the Defendants which have harmed, and continue to harm, the U.S. Government, the Relator, and the public.

4. This action is based upon information that the Relator solely possesses from his eyewitness and personal knowledge of the false claims and the violations of environmental, financial fraud, tax fraud, and obstruction of justice statutes. This information supports the existence of knowingly false claims to obtain funds from the United States by the Defendants in violation of 31 U.S.C. Sections 3729(a)(1)(A), (B), and (C).

5. Furthermore, the Relator is an original source of this information under 31 U.S.C. Section 3730(e)(4)(B). He has provided this information to the U.S. Justice Department as required under Section 3730(b)(2).

## PARTIES

6. The United States of America is named as the Plaintiff pursuant to 31 U.S.C. Section 3730(b)(1) and because the U.S. Treasury Department awarded funds to the Defendants from the Capital Purchase Program.

7. Relator William Q. Tingley III ("Tingley") is a citizen of the United States. He resides at 225 Prospect Avenue N.E., Grand Rapids, Michigan 49503.

8. Defendant Fifth Third Bancorp ("Fifth Third") is an Ohio banking corporation. Its principal office is located at 38 Fountain Square Plaza, Cincinnati, Ohio 45263. Fifth Third has offices and conducts business in the Western District of Michigan. Before receiving funds from the Capital Purchase Program, Fifth Third acquired Old Kent Financial Corporation ("Old Kent"). It is Old Kent's successor. All references to Fifth Third include Old Kent.

9. Defendant PNC Financial Services Group Inc. ("PNC") is a Pennsylvania banking corporation. Its principal office is located at One PNC Plaza, 249 Fifth Avenue, Pittsburgh, Pennsylvania 15222. PNC has offices and conducts business in the Western District of Michigan. Before receiving funds from the Capital Purchase Program, PNC acquired National City Corporation and National City Community Development Corporation (collectively, "National City"). It is National City's successor in this matter. All references to PNC include National City. Collectively, Fifth Third and PNC are referred herein as the "Banks".

10. 940 Monroe L.L.C. ("940 Monroe") was a Michigan limited liability company. Its last known address was 550 Kirtland Street S.W., Grand Rapids, Michigan 49507. 940 Monroe owned, redeveloped, and managed the Boardwalk property. 940 Monroe was owned by Fifth Third (initially as Old Kent), PNC (through its predecessor National City), Thomas Beckering (owner of Pioneer), and the Dykema family (owner of Dykema Excavators). The Defendant Banks had financial control of 940 Monroe and designated Beckering as the company's manager. Collectively, the Defendant Banks are referred herein as the company's "Bank Members". Collectively, Beckering and the Dykema family are referred herein as the company's "Developer Members".

11. The Boardwalk is an old furniture factory that 940 Monroe redeveloped as a residential-commercial complex, located at 940 Monroe Avenue N.W., Grand Rapids, Michigan 49503. The Boardwalk's site was a brownfield with soil known to be severely contaminated with hazardous substances.  This redevelopment project has been known at various times as the B&G Building, the Berkey & Gay Building, and the Boardwalk.  It is referred to herein as the "Boardwalk".

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to:

   a. 31 U.S.C. Section 3732(a), which specifically confers jurisdiction for this False Claims Act case;

   b. 28 U.S.C. Section 1331, which confers jurisdiction for federal questions arising under the laws of the United States; and

   c. 28 U.S.C. Section 1345, because the United States is a plaintiff.

13. Venue and personal jurisdiction are proper in the Western District of Michigan in which the Relator resides, the Defendants transact business, and most of the events alleged herein occurred.

## SUMMARY OF OFFENSES
### False Claims

14. The Capital Purchase Program ("CPP") is administered by the Office of Financial Stability of the U.S. Treasury Department, as authorized under the Emergency Economic Stability Act of 2008.

15. The purpose of the CPP was to provide capital from the Treasury Department, in exchange for preferred stock, to certain financial institutions which were financially sound except for a reduction in net worth because of a general decline in the value of assets arising from temporary illiquidity in the markets for those assets.

16. The CPP was not intended to address reductions in a financial institution's net worth because of liabilities arising from violations of state and federal environmental, bank fraud, and tax fraud statutes.

17. On December 31, 2008, Fifth Third signed a CPP agreement with the Treasury Department. This agreement contained specific representations by Fifth Third about liabilities and other conditions that may have a materially adverse effect on it.  Under this agreement Fifth Third received $3.4 billion in CPP funds in exchange for preferred stock issued to the Treasury Department.

18. On December 31, 2008, PNC signed a CPP agreement with the Treasury Department. This agreement contained specific representations by PNC about liabilities and other conditions that may have a materially adverse effect on it. Under this agreement PNC received $7.5 billion in CPP funds in exchange for preferred stock issued to the Treasury Department.

19. Fifth Third and PNC made the following representations in their CPP Agreements:

   a. In Paragraph 2.2(j), Fifth Third and PNC each represented that it and its subsidiaries had no undisclosed materially adverse liabilities of any nature;

   b. In Paragraph 2.2(l), Fifth Third and PNC each represented that there was no undisclosed materially adverse threat of a legal claim, action, suit, investigation, or proceeding against it or any subsidiary;

   c. In Paragraph 2.2(m), Fifth Third and PNC each represented that it and its subsidiaries had complied in all respects with, and were not in an undisclosed materially adverse violation of, any state or federal law, regulation, or order;

   d. In Paragraph 2.2(o), Fifth Third and PNC each represented that it and its subsidiaries had no materially adverse state or federal tax deficiency; and

   e. In Paragraph 2.2(q), Fifth Third and PNC each represented that there was no undisclosed threat of a claim or action of any nature that could impose a materially adverse liability against it or any subsidiary relating to the release of hazardous substances.

20. All of the liabilities were current at the time the Banks signed their CPP Agreements because they arose from offenses that were either within the statute of limitations or a continuing and ongoing threat to the public or tolled by the Defendants' obstruction of law enforcement and the courts or tolled by 18 U.S.C. Section 3287.

21. Fifth Third's representations were false, and Fifth Third senior executives knew they were false when made. The Treasury Department's reliance upon Fifth Third's false representations were material to Fifth Third's receipt of CPP funds.

22. PNC's representations were false, and National City senior executives knew they were false when made. PNC acquired National City preemptively to prevent its purchase by a competitor. PNC chose to buy National City blind because it had applied for CPP funds to pay for the acquisition. As National City's successor, National City's knowledge is PNC's knowledge. The Treasury Department's reliance upon PNC's false representations were material to PNC's receipt of CPP funds.

23. Fifth Third's and PNC's representations were false because neither disclosed in their CPP Agreements or in any other manner to the U.S. Government:

4

a. Each Bank's liability for personal injury, property damage, environmental and natural resource damage, and state and federal civil penalties for ordering and then fraudulently concealing the unregulated clean-up of the Boardwalk brownfield that caused the release of 25,000 tons of contaminated soil into the environment;

b. Fifth Third's financial fraud liability to National City for Old Kent's concealment of the lack of environmental due diligence for the Boardwalk project to obtain more than $20 million in funds from National City for the project;

c. PNC's financial liability to purchasers and financiers of Boardwalk property interests for void mortgages relating to National City's subsequent maintenance of Fifth Third's fraudulent concealment of the physical and legal environmental disposition of the Boardwalk site; and

d. Each Bank's tax liability relating to mischaracterizing loan proceeds as genuinely at-risk equity investments in 940 Monroe to unlawfully acquire the Boardwalk project's historic rehabilitation tax credits.

24. Pioneer General Contractors, Inc. ("Pioneer"), a Michigan corporation, and Dykema Excavators Inc. ("Dykema Excavators"), a Michigan corporation, acted in concert with Fifth Third and PNC's predecessor National City to cause these liabilities and then to keep them concealed from regulatory agencies, law enforcement, and the courts so that there was no public record of them.

### Environmental Offenses

25. The Boardwalk site was known to be a severely contaminated brownfield. In December 1999, 940 Monroe conducted an environmental site assessment that confirmed this ("ESA"). In February 2000, 940 Monroe disclosed to the Michigan Department of Environmental Quality ("MDEQ") that the Boardwalk was a contaminated brownfield subject to waste management regulations ("Disclosure").

26. In March 2000, 940 Monroe's environmental consultant issued a due care plan that mandated controls to prevent the release of the Boardwalk's contaminated soil into the environment ("Due Care Plan").

27. Old Kent, National City, Pioneer, and Dykema Excavators each received copies of the ESA, the Disclosure, and the Due Care Plan and had knowledge of their contents before Pioneer and Dykema Excavators began removing soil from the Boardwalk site. Old Kent specifically directed Beckering to remove all of the Boardwalk's contaminated soil without additional environmental study or oversight by the MDEQ as a condition of financing the project.

28. From April through November 2000, Pioneer and Dykema Excavators removed 25,000 tons of contaminated soil from the Boardwalk site in three phases. They dumped all of the soil off-site at illegal landfills in the Grand Rapids vicinity. With knowledge that the soil was hazardous to human life and health, at no time did Pioneer or Dykema Excavators implement

any controls to prevent the release of this contaminated soil into the environment.

29. During the first phase from April through July 2000, Dykema Excavators excavated the southern section of the Boardwalk site, known as the "South Yard", down to bedrock for the construction of a new parking ramp. It removed about 12,000 tons of contaminated soil and dumped it off-site at the defunct Monroe North Water Filtration Plant. Dykema Excavators released all of this soil into the environment without implementing any of the Due Care Plan controls ("South Yard Releases").

30. During the second phase from July through November 2000, Pioneer excavated the basement and the industrial courtyards of the old factory building to accommodate a remodeling for the Boardwalk's anchor tenant. It removed about 11,000-12000 tons of contaminated soil and dumped it off-site at the Filtration Plant and other nearby locations. Pioneer released all of this soil into the environment without implementing any of the Due Care Plan controls ("Building Releases").

31. During the third phase on November 14 and 15, 2000, Pioneer and Dykema Excavators cleaned and leveled the northern section of the Boardwalk site, known as the "North Lot", for the construction of a new surface parking lot. They removed about 1,000-2,000 tons of contaminated soil and dumped it off-site at different locations in the Grand Rapids vicinity. Pioneer and Dykema Excavators released all of this soil into the environment without implementing any of the Due Care Plan controls ("North Lot Releases").

32. The Contractors, in concert with the Banks, unlawfully managed the Boardwalk's contaminated soil on-site in violation of 42 U.S.C. Section 6928(d)(2) and unlawfully transported and disposed of it off-site in violation of Section 6928(d)(1).

33. The Defendants committed these environmental offenses knowing that they endangered human human life and health in felony violation of 42 U.S.C. Section 6928(e) and MCL 324.20139(2)(a).

34. To conceal these offenses, the Defendants deliberately failed to keep records, falsified records, and made false statements to regulators and law enforcement officials about their soil removal activities in felony violation of 42 U.S.C. Section 6928(d)(3) and MCL 324.20139(2)(b).

**Financial Fraud**

35. The Disclosure falsely stated that the South Yard was not contaminated because it consisted of recently deposited clean fill. The Due Care Plan contradicted the Disclosure and stated that all of the Boardwalk site's soil was contaminated and subject to the controls mandated in it.

36. No later than March 2000, Old Kent was aware of this contradiction and of the plan to excavate the South Yard to bedrock for the construction of a new parking ramp. Old Kent knew that if the Due Care Plan were correct, excavation of the South Yard would release

several thousand tons of contaminated soil into the environment.

37. The contradiction would have been resolved if Old Kent had followed its ordinary due diligence and instructed 940 Monroe to pay the MDEQ the standard $750 fee to determine whether or not the Disclosure was accurate. Old Kent deliberately chose not to do so, because: (a) It knew that the South Yard was contaminated, (b) a determination by the MDEQ would have exposed that fact, and (c) the MDEQ would then impose environmental controls on the South Yard's excavation adding significant costs and delays to the Boardwalk project.

38. Old Kent did not want these costs and delays incurred because it planned on becoming an owner of 940 Monroe, which needed $25.5 million in funding from another bank in addition to $9.1 million from Old Kent to complete the Boardwalk project by March 2001.

39. To obtain these funds from National City, Old Kent, as National City's agent for the Boardwalk project, concealed the true environmental disposition and the lack of due diligence from it. Relying upon Old Kent's false representations and misleading omissions on these matters, National City provided the funds starting in March 2001.

40. Old Kent fraudulently obtained $25.5 million in funds for 940 Monroe from National City in violation of 18 U.S.C. Section 1344.

41. Old Kent's fraudulent concealment provided a false pretext under which the Contractors caused the South Yard, Building, and North Lot Releases.

42. Five years later in May 2006, National City took over control of the Boardwalk project and it converted into residential condominiums. By selling condominiums National City received funds from mortgage lenders that reduced the principal balance of the loans it had made to 940 Monroe.

43. No later than May 2006 National City was aware of the contradiction between the Disclosure and the Due Care Plan that Old Kent (and subsequently Fifth Third) had concealed. It chose to maintain this concealment and like Old Kent before it, National City chose to not have the MDEQ make a determination because that would have revealed the Releases.

44. By keeping this concealment in place, National City permitted 940 Monroe to sell condominiums without disclosing the Releases to the buyers. Relying upon this misrepresentation by omission, National City received funds from mortgage lenders that reduced 940 Monroe's debt to it. Furthermore, under Michigan law, the nondisclosure of the Releases voided the condominium purchases and imposed a liability of void mortgages upon other lenders to, at least, the temporary benefit of National City.

45. National City fraudulently obtained the proceeds of mortgage loans from other lenders to reduce 940 Monroe's debt to it in violation of 18 U.S.C. Section 1344.

**Tax Fraud**

46. Old Kent (and subsequently Fifth Third) and National City became owners of 940 Monroe to receive the allocation of 99% of the Boardwalk's state and federal historic rehabilitation tax credits.

47. On March 9, 2001, Old Kent and National City, as the Bank Members, re-organized 940 Monroe under a new operating agreement to receive the tax credit allocation, financial control, and voting control from the Developer Members in exchange for $5.1 in "capital contributions" to the company.

48. The operating agreement guaranteed repayment of the Bank Members' loans, allocation of the tax credits, and return of capital contributions ahead of similar distributions to the Developer Members. In particular the Bank Members' return of capital contributions was fixed at a 20% internal rate of return and subject to neither risk nor reward. Furthermore, the Developer Members personally guaranteed and indemnified the Bank Members against all operational risk.

49. The Bank Members' capital contributions were not genuinely at-risk equity investments in 940 Monroe. They were loans disguised as at-risk equity to circumvent the prohibition on the purchase of historic rehabilitation tax credits. The Bank Members valued their ownership interests in 940 Monroe at no more than the value of the tax credits, and once the tax credits were exhausted they disposed those interests. Their ownership of 940 Monroe was only for tax purposes and had no economic substance. As such 940 Monroe was a sham limited liability company.

50. On September 1, 2004, Fifth Third loan officer Kenneth Danhoff signed an affidavit admitting that Fifth Third's only interest in 940 Monroe was the allocation of tax credits and that it funded the company only with bank loans.

51. Fifth Third and National City used the tax credits they had obtained from 940 Monroe to fraudulently reduce their federal income tax liability from 2001 through 2006 in violation of IRC Section 7201.

**BACKGROUND**
**Old Kent organizes 940 Monroe**

52. At the time the Boardwalk project was first organized in 1997, Old Kent senior executives were concerned that the bank was an attractive target for a hostile takeover. To prevent this Chairman David Wagner directed his executives to increase the bank's assets and earnings to raise its stock price. When record assets and earnings fail to do so, Wagner pressed the executives to loosen standards to the further increase the number and size of real estate loans. Old Kent's financing of the Boardwalk project was one such deal.

53. On its face, the Boardwalk project was not a commercially viable venture. It would not produce sufficient revenue as a mixed-income apartment complex. To change this so that

8

Old Kent could finance the project, the senior partners of the bank's law firm Warner Norcross & Judd L.L.P. ("Warner Norcross") used their influence in the community to reduce costs, obtain subsidies, and increase revenue.

54. This influence included Warner Norcross partner John Logie, as mayor of Grand Rapids, providing the Boardwalk project with the Filtration Plant as a dump for its contaminated soil, certifying it as a public project, subsidizing it with a $2.5 million rebate of property taxes, endorsing its eligibility for historic rehabilitation tax credits, and eliminating restrictions on the number of commercial tenants. Also, partner Charles McCallum influenced his client Spectrum Health Corporation to commit its medical training consortium as the project's anchor tenant.

55. Meanwhile, on February 26, 1999, the Developer Members organized 940 Monroe. 940 Monroe was the legal entity that would receive the tax credits which would be allocated to the Bank Members when they became members of the company.

56. At Old Kent's direction, on April 15, 1999, Beckering, as the manager of 940 Monroe, re-organized the Boardwalk project into two limited liability companies. The South Yard was separated from 940 Monroe and assigned to 900 Monroe L.L.C. The South Yard posed two problems for Old Kent. First, it had to be excavated down to bedrock to accommodate the construction of a new parking ramp. This required the removal and off-site disposal of contaminated soil, and Old Kent did not want membership in a company directly involved in that removal. Second, the parking ramp construction was not eligible for the tax credits, which eliminated the rationale for membership in that part of the project.

57. By this time, Wagner's loose lending standards had not raised the price of Old Kent stock and the bank became a target for acquisition by Fifth Third. Under the pressure of that prospective acquisition, the Old Kent senior executive loan committee pushed to approve and close sub-standard deals like the Boardwalk project to inflate the bank's stock price.

58. To this end, Old Kent directed Beckering to resolve the removal of the South Yard's contaminated soil by providing the bank with the ESA that mischaracterized the soil as clean and not subject to the expense and delays of hazardous waste management. Old Kent offered Beckering a $1.5 million loan upon receipt of a "clean" ESA.

**Old Kent directs clean-up of Boardwalk site**

59. During November 1999, Beckering's environmental consultant, Frank Marshall, sampled the Boardwalk project's soil and sent a preliminary report confirming that the site was a severely contaminated with hazardous substances at levels exceeding residential clean-up criteria. On November 30, 1999, Beckering faxed this report to Old Kent.

60. On December 16, 1999, Marshall then issued the ESA which falsely declared that the South Yard consisted of clean fill. This conformed to Old Kent's requirement. It then closed the $1.5 million loan to Beckering and construction began.

61. On February 23, 2000, 940 Monroe submitted the Disclosure to the MDEQ, which incorporated the false ESA. The effect of the Disclosure was that the Boardwalk site was a contaminated brownfield subject to hazardous waste regulation, with the exception of the South Yard which was mischaracterized as clean fill. At the time, Old Kent, Pioneer, and Dykema Excavators only planned to excavate the South Yard and not the Building and North Lot section of the site.

62. Beckering sent Old Kent a copy of the Disclosure. Contrary to its ordinary due diligence, Old Kent did not direct Beckering to pay the $750 fee to the MDEQ for a determination as to the accuracy of the environmental site assessment. The MDEQ's review of the assessment would have exposed the false characterization of the South Yard as clean fill and mandated expensive and time-consuming environmental controls to prevent the release of contaminated soil into the environment during the excavation of the South Yard for the new parking ramp.

63. On March 16, 2000, Marshall sent 940 Monroe the Due Care Plan for internal distribution only. It stated that all of the Boardwalk's soil was hazardous waste and required 940 Monroe to implement controls to prevent its release into the environment. These controls included: (a) Keeping all soil in its original place, (b) not releasing soil off-site, (c) capping all exposed soil, (d) notifying contractors in writing of these controls, and (e) documenting compliance with these controls.

64. Afterwards, Beckering sent of copy of the Due Care Plan to Old Kent. This put the bank on notice that the representations of the South Yard as clean fill were either false or irrelevant in terms of the Due Care Plan controls required for the Boardwalk's soil.

65. Despite this knowledge, Old Kent instructed Beckering that permanent project financing was contingent upon 940 Monroe removing the Boardwalk's contaminated soil without any further study of the site's environmental condition. Spectrum Health's medical training consortium had committed to a ten-year lease for the basement level of the Boardwalk building, which meant excavating not just the South Yard but the entire Boardwalk site.

66. Beckering later stated under oath that Old Kent wanted a "clean environmental" condition for the site and that 940 Monroe did not receive a commitment for permanent financing until the site "was clean and done and over, and they [i.e. Old Kent] were happy".

67. To comply with Old Kent's demand, from April through November 2000, the Contractors removed 25,000 tons of contaminated soil from the Boardwalk site and dumped it at the Filtration Plant and other off-site locations in three phases causing the South Yard, Building, and North Lot Releases.

## Evidence of the Environmental Offenses

68. The Relator's workplace is next-door to the Boardwalk site. He was an eyewitness to the Releases. He photographed and kept videotapes from his workplace's security system that recorded them. The Relator has recorded at least 800 of the Releases as transports of the Boardwalk's soil to off-site locations by the Contractors.

10

69. On October 17, 2000, James Czanko, 940 Monroe project manager, told Bonnie White of the MDEQ that the Contractors dumped some of the Boardwalk's contaminated soil at a landfill in Sparta, Michigan.

70. Daniel Schimmel, the general manager of Dykema Excavators, told MDEQ officials Gerard Heyt on November 2, 2000 and Bonnie White on November 8, 2000, that his company had dumped Boardwalk soil at the Filtration Plant.

71. On December 6, 2000, Gary Schenk, attorney for Dykema Excavators, wrote White a letter acknowledging the dumping of Boardwalk soil at the Filtration Plant.

72. On March 7, 2001, Old Kent, on its own behalf and as an agent of National City, filed a mortgage with the Kent County Register of Deeds that publicly warranted that no hazardous substances contaminated the Boardwalk site. [Old Kent Boardwalk mortgage, Paragraph 13.]

73. On March 9, 2001, the Bank Members and the Developer Members signed an operating agreement warranting, in conformity with the mortgage, that no hazardous substances contaminated the Boardwalk site. [Sections 9.5(c), 9.5(e), 9.5(v), and 10.1.]

74. On April 25, 2001, Beckering stated in a deposition that the Contractors removed the soil from the Boardwalk site because Old Kent required it.

75. Robert Hayes, former MDEQ chief hydrologist and a forensic geologist examined the Relator's evidence, 940 Monroe's tests of Boardwalk soil, and the MDEQ's tests of Filtration Plant soil. On January 6, 2005, he submitted an affidavit to the Kent County Circuit Court that the Contractors had removed 25,000 tons of soil from the Boardwalk site and caused the Releases.

76. On May 1, 2006, National City filed a mortgage with the Kent County Register of Deeds that publicly warranted that no hazardous substances contaminated the Boardwalk site. [National City Boardwalk mortgage, Paragraph 24.]

77. On May 17, 2012, John Sperla, attorney for Pioneer, admitted in a court hearing that the Relator's allegations of the Releases were factually accurate. [Court transcript, Page 33, Lines 6-11.]

78. Judge James Redford of the Kent County Circuit Court stated at the same hearing that the attorneys for Fifth Third, PNC, Pioneer, and Dykema Excavators all knew that "tens of thousands of cubic yards of soil was removed" from the Boardwalk site. [Page 42, Lines 22-25.]

79. Presently there is no genuine controversy that the Releases occurred as a consequence of the soil removal activity by the Contractors.

**The Banks take ownership of 940 Monroe**

80. In June 2000 Old Kent assigned the financing of the Boardwalk project to Danhoff. As the principal loan officer, Danhoff was responsible for supervising 940 Monroe's redevelopment of the Boardwalk site, because Old Kent planned to acquire a membership interest in the company. Wagner wanted to maximize the apparent value of such assets before entering into acquisition negotiations with Fifth Third.

81. In October 2000 Beckering submitted a building permit to the City of Grand Rapids for the Boardwalk project. He valued it at $150 million and paid a commensurate permit fee, which gave 940 Monroe a net worth of $120 million. In turn the asset value of the membership interest that Old Kent later took in 940 Monroe would be significant and material to the bank's financial condition based on such a net worth.

82. At the same time Wagner entered into negotiations with Fifth Third CEO George Schaefer.

83. Meanwhile, the Relator reported the Releases to the U.S. Environmental Protection Agency ("USEPA") and the MDEQ. At the direction of the USEPA official Ralph Dolhoff, Heyt and White of the MDEQ investigated the Relator's report during October and November 2000.

84. Beckering brought Marshall back to the Boardwalk site to respond to the MDEQ's investigation. On November 16, 2000, Marshall gave White a preliminary report falsely claiming that there had been no Releases and that all of the soil original to the site remained there. On November 17, 2000, MDEQ Director Russell Harding issued a letter to Michigan state legislators stating that 940 Monroe had provided a satisfactory answer to the Relator's report.

85. Danhoff then presented the Boardwalk financing proposal to the Old Kent senior loan committee, which included Chairman Wagner and CEO Kevin Kabat. The proposal included the bank taking a membership interest in 940 Monroe in exchange for the Boardwalk's historic rehabilitation tax credits. Wagner and Kabat approved the financing even though: (a) The loan proceeds exceeded the actual appraised project value of $24.9 million, (b) the site's unregulated clean-up ordered by Old Kent caused the Releases, and (c) there was no determination by the MDEQ to limit Old Kent's liability for the Releases.

86. On November 20, 2000, Fifth Third and Old Kent announced their agreement to complete the acquisition by the second quarter of 2001.

87. Danhoff had to close the financing of the Boardwalk project before the completion of the acquisition. On November 22, 2000, he gave 940 Monroe the commitment for the financing.

88. However, White was dissatisfied with Marshall's preliminary report and demanded further evidence that the soil original to the Boardwalk had not been removed from the site. In response to White, 940 Monroe directed Marshall to compile a final report that would close the MDEQ's investigation.

89. On January 2, 2001, Marshall submitted such a report to White ("Marshall Report"). It substantiated the claims of the preliminary report with faked soil tests and false affidavits from Pioneer employees.

90. The faked soil tests were "SS-1" of the South Yard and "NP-1" and "NP-2" of the North Lot. On November 3, 2000, Dykema Excavators principal Ben Dykema directed an environmental consultant to collect the SS-1 soil sample from a ramp of clean sandy fill that had been deposited at the South Yard two weeks earlier. It tested clean. The Marshall Report misrepresented that the SS-1 sample as soil original to the South Yard and proof that the Releases had not occurred.

91. On November 15, 2000, Dykema Excavators employee Daniel Schimmel directed an environmental consultant to collect the NP-1 and NP-2 soil samples from piles of clean top soil that had been deposited on the North Lot earlier that day. They tested clean. The Marshall Report misrepresented these samples as soil original to the soil beneath the basement and to the North Lot and proof that the Releases had not occurred.

92. On January 2, 2001, Pioneer employees Ward Kortz and Jon Fox signed affidavits falsely stating that the entire soil original to the Boardwalk remained on-site. The Marshall Report used these affidavits as proof that the Releases had not occurred.

93. White relied upon the Marshall Report to conclude that the Releases had not occurred and that 940 Monroe and the Contractors were in compliance with state law.

94. On February 22, 2001, Old Kent's environmental attorney, Warner Norcross partner John Byl, called White and asked her if the Marshall Report was sufficient to close the MDEQ's investigation. She said it was.

95. The MDEQ's acceptance of the fraudulent Marshall Report stopped all enforcement action that would have delayed the Boardwalk project's completion, avoided all remedial costs and civil penalties for the Releases, and any impairment of 940 Monroe's value as an Old Kent asset because of environmental liabilities.

96. On March 7, 2001, Old Kent closed the financing of the Boardwalk project with 940 Monroe. On behalf of Old Kent, Warner Norcross attorney Timothy Hillegonds prepared and filed a mortgage on the Boardwalk with the Kent County Register of Deeds which declared that the property was free of any hazardous substance contamination. This declaration directly contradicted the Marshall Report's claim that the contaminated soil remained on-site.

97. The financing consisted of $34.6 million in loans. Old Kent, and afterwards Fifth Third, funded $9.1 million of that amount and National City funded the balance. At the time the Boardwalk's appraised value was not $150 million as represented by Beckering in October 2000 but only $24.9 million, which was $10 million less than the final amount of the loans. Furthermore, about $5.1 million of the loan proceeds were mischaracterized by Old Kent and National City as a genuinely at-risk "capital contributions" in 940 Monroe to obtain 99% of the Boardwalk's historic rehabilitation tax credits which they valued at $5.5 million.

98. On March 9, 2001, Old Kent and National City re-organized 940 Monroe. Under a new operating agreement they became the controlling members with the Developers as subordinate members. The Boardwalk's revenue were committed first to repayment of the bank loans and then the repayment of the Bank Members' "capital contributions" of $5.1 million at a 20% internal rate of return.

99. Under the new operating agreement the Developer Members assumed all operational risk and reward while the Bank Members assumed none in exchange for financial control, voting control, and the Boardwalk's tax credits.

100.   At the time Old Kent acquired a controlling membership interest in 940 Monroe it had incurred:

   a. Environmental liability for the Releases and for their concealment from White, the MDEQ, and the USEPA;

   b. Bank fraud liability to the extent it had not disclosed the Releases to National City to obtain its participation in financing the Boardwalk project; and

   c. Tax fraud liability for obtaining the project's tax credits by mischaracterizing loan proceeds as "capital contributions" to 940 Monroe.

101.   Old Kent board member Peter Secchia confronted Wagner about the unfavorable price Fifth Third paid for Old Kent. He called Wagner a "crook" and blamed the sub-standard mortgage deals he permitted as the reason why Old Kent did not have the financial strength to demand a fair price from Fifth Third. He characterized the Boardwalk project as one such deal. He threatened to lead a shareholder suit against Wagner. Kabat intervened and talked Secchia out of filing a suit.

102.   On March 12, 2001, the Federal Reserve Board approved Fifth Third's acquisition of Old Kent. On April 2, 2001, Fifth Third closed the acquisition. Wagner became chairman of Fifth Third Bank-West Michigan and a board member of Fifth Third Bancorp. Kabat became vice chairman and CEO of Fifth Third Bank-West Michigan. In April 2007 he become CEO of Fifth Third Bancorp. Secchia took no new role in Fifth Third.

### The Banks incur liability for the Releases

103.   On March 9, 2001, the Banks acknowledged the large-scale removal of contaminated soil from the Boardwalk project site when they signed the new 940 Monroe operating agreement. The agreement warranted that the site was now clean in conformity with the declaration in the mortgage that the Boardwalk property was free of hazardous substance contamination.

104.   With the retention of Wagner and Kabat as senior executives, Fifth Third had actual knowledge of the Releases.

105.   Because Old Kent chose not to obtain a determination by the MDEQ in February 2000,

Fifth Third, as Old Kent's successor and a member of 940 Monroe, retained strict "arranger" liability under 42 U.S.C. Section 9607(a)(3) and MCL 324.20126(d) for the Releases.

106. National City had actual knowledge of the Releases no later than May 2006 when it filed a mortgage of the Boardwalk property with the Kent County Register of Deeds declaring that it was free of hazardous substance contamination while at the same time accepting a new environmental site assessment by Marshall declaring that all of the contaminated soil original to the Boardwalk remained on-site.

107. By March 2006, 940 Monroe's tax credits were exhausted and neither the company nor the Boardwalk property was of any use to Fifth Third and National City. On April 28, 2006, the banks re-organized 940 Monroe into two new limited liability companies to convert the property into condominiums and spread out the Boardwalk credit risk among lenders to condominium buyers. At this point National City took over the role of lead lender from Fifth Third.

108. On May 1, 2006, National City filed a new Boardwalk mortgage declaring that the site was free of hazardous substance contamination in contradiction to the Marshall Report and the representations 940 Monroe made in the Relator's federal court case.

109. On May 16, 2006, Marshall submitted a new disclosure to the MDEQ that stated it was brownfield that remained contaminated as originally found in 1999. This directly contradicted the mortgage filed by National City.

110. Despite the contradiction, National City did not request that the MDEQ make a determination as to the accuracy of Marshall's new disclosure. Such a determination would have revealed that the Releases had occurred and that the Marshall Report was a fraud. By not requesting a determination, National City maintained the false record of the Boardwalk environmental disposition that Fifth Third had established with the MDEQ and the federal court.

111. Because National City chose not to obtain this determination by the MDEQ in May 2006, it, as a member of 940 Monroe, retained strict "arranger" liability under 42 U.S.C. Section 9607(a)(3) and MCL 324.20126(d) for the Releases. This liability passed onto its successor, PNC.

112. To the extent that Fifth Third and PNC did not have knowledge of specific facts relating to the Releases, they, or their predecessors, cultivated deliberate ignorance by not verifying the environmental condition of the Boardwalk property before, during, and after its redevelopment by 940 Monroe through ordinary due diligence and the MDEQ's determination procedures.

113. Fifth Third and PNC are liable for the Releases because they, or their predecessors, required the soil removal that caused them as a condition of purchasing an interest in 940 Monroe. They were either deliberate or willfully reckless in causing the Releases because they withheld any action to enforce the due care plan, to report the Releases to the proper

authorities, and to remediate the Releases.

114.    To conceal their liability for the Releases, Fifth and PNC or their predecessors, by acts of commission and omission, directly or through their ownership of 940 Monroe concealed the Releases from state and federal authorities including the Treasury Department.

115.    Part of Fifth Third's and PNC's liability are civil penalties under state and federal law, including but not limited to a maximum fine of $37,500 for each release of Boardwalk soil for every day the release is unreported and unremediated.    Under U.S. Environmental Protection Agency enforcement guidelines, Fifth Third and PNC are liable for the maximum penalty because it deliberately or recklessly permitted the releases and they or their predecessors did not cooperate with authorities in reporting or remediation them.    Presently, Fifth Third's and PNC's liability for civil penalties is as much as $150 billion.

116.    Fifth Third's and PNC's liability was materially adverse to its financial condition at the time it signed the CPP Agreement with the Treasury Department.

**Fifth Third retaliates against the Relator**

117.    On February 28, 2001, the Relator sent Wagner a letter informing him about the Releases.

118.    On March 6, 2001, Pioneer employees entered the Relator's workplace to dump contaminated soil on the property in retaliation for reporting truthful information about the Releases to the USEPA and MDEQ.    The Relator later contracts a severely debilitating disease from exposure to the Boardwalk contamination.

119.    On March 6, 2001, in a closed session of the Grand Rapids City Commission, Logie denounced the Relator as a "liar" about the Releases and Old Kent's involvement in the Boardwalk project.

120.    On May 31, 2001, the Relator sent Fifth Third General Counsel Paul Reynolds a letter informing him of the Releases and Old Kent's failure to request any determinations from the MDEQ.

121.    After receiving no response from either Wagner or Reynolds, on July 17, 2001, the Relator mailed Fifth Third a notice of intent to file an environmental citizen suit in state court for relief from and remedy of the Releases.

122.    On March 6, 2002, the Relator mailed Fifth Third a notice of intent to file environmental citizen suit in federal court for relief from and remedy of the Releases.

123.    On May 10, 2002, Grand Rapids Assistant City Attorney Daniel Ophoff destroyed the minutes of the March 6, 2001, session at which Logie addressed the City Commission about the Releases while they were subject to a state court document production request.

124.    The Relator filed the federal environmental citizen suit in the U.S. District Court of Western Michigan.  On December 19, 2002, federal Magistrate Judge Ellen Carmody directed the Relator to turn over to Fifth Third, 940 Monroe, Pioneer, and Dykema Excavators the video, photographic, and documentary evidence of the Releases.  The Relator did so within a week.  After this the defendants raised a conflict of interest to change the presiding judge.

125.    Fifth Third entered into a joint defense agreement with 940 Monroe, Pioneer, and Dykema Excavators to oppose the Relator's environmental citizen suit.  After a new judge was assigned the case, on February 16, 2003, 940 Monroe's attorneys obstructed the federal court when they represented that White's finding that the Releases had not occurred was accurate.  At that time Fifth Third and its co-defendants all knew that White made that finding based upon the fraudulent Marshall Report.  Furthermore, they all knew that the Releases had in fact occurred.  Relying upon 940 Monroe's representation as truthful the federal court dismissed the Relator's suit.

126.    In retaliation against the Relator for his truthful witness about the Releases in federal court, Fifth Third and its co-defendants then motioned the federal court to sanction the Relator because he had knowledge of White's finding and therefore knew his allegations about the Releases were false.  The court granted the motion and sanctioned the Relator approximately $200,000.

127.    In further retaliation against the Relator, on April 25, 2003, Fifth Third fabricated a pretext to declare a loan secured by real properties owned by his family in default, even though there was not nor had ever been an untimely payment of that loan.  After meeting with bank officials, Thomas Schouten, the attorney for the Relator's family, told him that the top executives at Fifth Third had knowledge of the alleged default and that he had never encountered bankers who had such a personal animus against a customer.

128.    On May 12, 2003, the Relator mailed a package containing evidence of the Releases to Fifth Third CEO George Schaefer, Chief Risk Officer Malcolm Riggs, and Reynolds.

129.    On July 17, 2003, Fifth Third offered a forbearance agreement to the Relator's family.  The agreement was drafted with terms that would have the effect of releasing Fifth Third Bank-West Michigan from the Relator's environmental claims.  The Relator's family refused to sign it.

130.    On August 20, 2003, the Relator's family sent Schaefer, Reynolds, and Kabat a letter with new information about the Releases and bank fraud liability relating to them.

131.    On the same day, the Relator sent a letter to Griggs and to the board members of Fifth Third's Risk Compliance Committee informing them of the same.

132.    On September 6, 2003, Fifth Third's attorney Brian Page threatened the Relator's family with foreclosure of their properties, including their residence.  Fifth Third then attempted to provoke an actual default of the loan by no longer sending monthly invoices to his family.

The Relator made payments at local Fifth Third branch offices in person to prevent default until March 31, 2004, when his family was able to liquidate one of the properties to pay off the loan.

133.    On December 31, 2003, Michigan Assistant Attorney General Thomas Piotrowski met with the Relator and reviewed the videotape of the Releases. He concluded that the Marshall Report was a fraud. He ordered the MDEQ to sample soil from the Filtration Plant for evidence of illegal dumping there.

134.    On April 13, 2004, the Relator mailed another package of evidence of the Releases and the related bank fraud to Fifth Third senior executives including Schaefer, Reynolds, CFO Neal Arnold, Auditor Daniel Poston, and the bank's audit firm Deloitte Touche.

135.    On the same day, the Relator mailed the same package to the corresponding senior executives at National City.

136.    On June 30, 2004, forensic geologist and former MDEQ chief hydrologist Robert Hayes analyzed the Filtration Plant soil test results and the Relator's evidence of the Releases and determined that the Filtration Plant had been used as an illegal dump for the Boardwalk's contaminated soil.

137.    On July 17, 2004, Fifth Third received court notice of Hayes's findings.

138.    On July 27, 2004, during the proceedings of the Relator's state court environmental citizen suit, Marshall's former employer disavowed the Marshall Report in Kent County Circuit Court and copied its disavowal to Fifth Third.

139.    On September 1, 2004, Danhoff signed an affidavit to claim lender immunity in defense to Hayes's findings and the Marshall Report disavowal. By claiming to only be a lender for the Boardwalk project, Danhoff inadvertently admitted that the "capital contributions" to 940 Monroe in exchange for the project's tax credits were not genuinely at-risk equity investments.

140.    On January 20, 2005, the Kent County Circuit Court reviewed Hayes's findings and the Relator's evidence of the Releases and ruled that he had standing to maintain the environmental citizen suit.

141.    To exert additional pressure on the Relators, in March 2005 Fifth Third put the loans to the Relator's employer, a company owned and operated by his father, into the bank's workout department and then defamed his father by falsely stating to competing banks that he defaulted on these business loans. The objective of this retaliation was to deny the capital his father's company needed to purchase new machine tools.

142.    By September 2005 the Relator's family and company were able to re-finance the last of their Fifth Third loans with Huntington Bank. Fifth Third banker Chris Reibold then told Huntington banker Scott Pastoor that he had never dealt with customers as financially sound

as the Relator's family and company and that Fifth Third had no good reason for putting their loans into the work-out department.

143.    On September 30, 2005, the MDEQ completed its review of Hayes's analyses of all the evidence relating to the Releases and stated in an internal memorandum that his methodology was sound but the agency lacked the resources to further investigate the matter.

144.    In February 2007 the Michigan Court of Appeals ruled that the Relator lacked standing in his state court environmental citizen suit.  In March 2008 the Kent County Circuit dismissed the case.  At this point there was no court or regulatory proceeding against Fifth Third or National City.

### Fifth Third signs the CPP Agreement

145.    By 2008 Fifth Third's tier one capital reserve had badly deteriorated.  Senior executives, Poston in particular, had allowed assets to be overvalued and liabilities to be concealed in public reports to misrepresent the bank's financial strength.  This included liabilities related to the Boardwalk project.  At the time these misrepresentations were made, Kabat as CEO, Poston as CFO, and Reynolds as General Counsel, all had either actual knowledge or deliberate ignorance of the Boardwalk liabilities and of the Releases in particular.

146.    Fifth Third's liability for the Releases remained current because the bank had strict liability both directly and through 940 Monroe for continuing violations of state and federal environmental statutes and for evading these liabilities by obstruction of the MDEQ and the federal court.

147.    Fifth Third's liability for the bank fraud against National City to obtain more than $20 million to fund the loans for the Boardwalk project remained current because the statute of limitations had not expired.

148.    Fifth Third's liability for the tax fraud relating to disguising loan proceeds as "capital contributions" to 940 Monroe to purchase the Boardwalk project's tax credits remained current because the statute of limitations had not expired.

149.    Each of these liabilities was materially adverse to Fifth Third.

150.    On December 31, 2008, with knowledge of these liabilities, Reynolds on behalf of Fifth Third signed the CPP Agreement with the Treasury Department without disclosing them.

### PNC signs the CPP Agreement

151.    By 2008 National City's sub-standard lending practices had severely compromised the bank's financial condition.  By October 2008 the Treasury Department was unwilling to sign a CPP Agreement with it, which made National City a target for acquisition.

152.    In October 23, 2008, National City had come to terms to be acquired by U.S. Bancorp.

At the last moment, PNC made a superior offer and acquired National City. To act quickly, PNC chose to forego the due diligence that would have exposed unreported liabilities such as those related to the Boardwalk project because it knew it would have the use of CPP funds to pay for the acquisition.

153. National City's liability for the Releases remained current because the bank had strict liability both directly and through 940 Monroe for continuing violations of state and federal environmental statutes and for evading these liabilities by maintaining Fifth Third's obstruction of the MDEQ and the federal court.

154. National City's liability for the tax fraud arising from disguising loan proceeds as "capital contributions" to 940 Monroe to purchase the Boardwalk project's tax credits remained current because the statute of limitations had not expired.

155. Each of these liabilities was materially adverse to PNC as National City's successor. To the extent that PNC did not have actual knowledge of these liabilities, its ignorance was reckless in its lack of due diligence and bad faith reliance upon the Treasury Department's emergency measures to maintain the integrity of the banking system.

156. On December 31, 2008, with reckless disregard of these liabilities, PNC signed the CPP Agreement with the Treasury Department without disclosing them. PNC then used a portion of the proceeds to pay for the National City acquisition.

## COUNT I: FALSE CLAIM
## (as to PNC)

157. The preceding allegations are re-alleged and incorporated by reference.

158. In Paragraph 2.2(q) of the CPP Agreement, PNC represented that there were no proceedings or liabilities, or threat of such, against it or its subsidiaries relating to the release of contaminated soil from the Boardwalk property that may be a materially adverse effect on it.

159. This representation was false when PNC made it, because the liabilities relating to the releases of Boardwalk soil had already been incurred as an arranger through its purchase of an ownership interest in 940 Monroe.

160. PNC knew the representation was false when made, because it had knowledge of the Boardwalk soil's contamination, the controls required to prevent the soil's release, the releases of the soil, its requirement to remove the soil as a condition of its purchase of 940 Monroe, and its cooperation with 940 Monroe in maintaining a false record with the MDEQ and the U.S. District Court that all the Boardwalk soil remained on-site.

161. PNC, as publicly-held company, never reported these liabilities, in any manner on its Form 10-Q quarterly reports, Form 10-K annual reports, and Form 8-K "changed conditions" reports to the Securities and Exchange Commission ("SEC"), from 2001 to the present, in

violation of 15 U.S.C. Sections 78m(a) and (b)13.

162. PNC's senior executive officers certified these reports in violation of 15 U.S.C. Section 7421(a)14.

163. PNC's liabilities relating to the releases of Boardwalk soil were a materially adverse effect on it when it signed the CPP Agreement with the Treasury Department.

164. PNC made the false representation in the CPP Agreement to conceal from the Treasury Department the materially adverse effect of these liabilities on its financial condition in violation of 31 U.S.C. Section 3729(a)(1)(A).

165. PNC's failure to report the releases to the MDEQ supported its false representation in the CPP Agreement in violation of 31 U.S.C. Section 3729(a)(1)(B).

166. PNC's failure to disclose materially adverse environmental liabilities in its SEC reports and certifications supported its false representation in the CPP Agreement in violation of 31 U.S.C. Section 3729(a)(1)(B).

167. PNC intended that the Treasury Department rely upon its representations in the CPP Agreement and its lack of disclosures to the MDEQ and SEC as true and accurate to receive CPP funds.

168. The Treasury Department relied upon these representations to transfer $7.5 billion in CPP funds to PNC.

169. The United States of America has suffered actual damages because of these knowingly false representations.

## COUNT II: FALSE CLAIM
### (as to Fifth Third)

170. The preceding allegations are re-alleged and incorporated by reference.

171. In Paragraph 2.2(q) of the CPP Agreement, Fifth Third represented that there were no proceedings or liabilities, or threat of such, against it or its subsidiaries relating to the release of contaminated soil from the Boardwalk property that may be a materially adverse effect on it.

172. This representation was false when Fifth Third made it, because the liabilities relating to the releases of Boardwalk soil had already been incurred as an arranger through its purchase of an ownership interest in 940 Monroe.

173. Fifth Third knew the representation was false when made, because it had knowledge of the Boardwalk soil's contamination, the controls required to prevent the soil's release, the releases of the soil, its requirement to remove the soil as a condition of its purchase of 940

Monroe, and its cooperation with 940 Monroe in maintaining a false record with the MDEQ and the U.S. District Court that all the Boardwalk soil remained on-site.

174.    Fifth Third, as a publicly-held company, never reported these liabilities, in any manner on its Form 10-Q quarterly reports, Form 10-K annual reports, and Form 8-K "changed conditions" reports to the Securities and Exchange Commission ("SEC"), from 2001 to the present, in violation of 15 U.S.C. Sections 78m(a) and (b)13.

175.    Fifth Third's senior executive officers certified these reports in violation of 15 U.S.C. Section 7421(a)14. Fifth Third's liabilities relating to the releases of Boardwalk soil were a materially adverse effect on it when it signed the CPP Agreement with the Treasury Department.

176.    Fifth Third made the false representation in the CPP Agreement to conceal from the Treasury Department the materially adverse effect of these liabilities on its financial condition in violation of 31 U.S.C. Section 3729(a)(1)(A).

177.    Fifth Third's failure to report the releases to the MDEQ supported its false representation in the CPP Agreement in violation of 31 U.S.C. Section 3729(a)(1)(B).

178.    Fifth Third's failure to disclose materially adverse environmental liabilities in its SEC reports and certifications supported its false representation in the CPP Agreement in violation of 31 U.S.C. Section 3729(a)(1)(B).

179.    Fifth Third intended that the Treasury Department rely upon its representations in the CPP Agreement and its lack of disclosures to the MDEQ and SEC as true and accurate to receive CPP funds.

180.    The Treasury Department relied upon these representations to transfer $3.4 billion in CPP funds to Fifth Third.

181.    The United States of America has suffered actual damages because of these knowingly false representations.

## COUNT III:  FALSE CLAIM CONSPIRACY

182.    The preceding allegations are re-alleged and incorporated by reference.

183.    PNC acted in concert with Fifth Third, 940 Monroe, and 940 Monroe's contractors to make and maintain knowingly false records with the MDEQ, the U.S. District Court, the SEC, and the Treasury Department to conceal its liabilities relating to the releases of Boardwalk soil.

184.    These records supported the knowingly false representations PNC made in its CPP Agreement with the Treasury Department in violation of 31 U.S.C. Section 3729(a)(1)(B).

185. PNC's conspiracy with Fifth Third, 940 Monroe, and 940 Monroe's contractors to make and maintain these false records is in violation of 31 U.S.C. Section 3729(a)(1)(C).

186. The United States of America has suffered actual damages because of PNC's conspiracy with Fifth Third, 940 Monroe, and 940 Monroe's contractors.

## REQUEST FOR RELIEF

WHEREFORE, the Relator requests the following relief on his own behalf and that of the United States of America:

1. Judgment against the Defendants in an amount equal to the three times the damages suffered by the United States of America because of its false claim, plus a civil penalty of $11,000 for each violation of 31 U.S.C. Section 3729;

2. An award to the Relator of the maximum amount allowed for the Relator's statutory share of the amount recovered by the United States of America in this action;

3. Reimbursement of the Relator's attorney fees, costs, and expenses incurred from the action; and

4. All other remedy and relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiff demands that this matter be tried by jury.

DATE: December 30, 2014             Respectfully submitted,

                                    KREIS, ENDERLE, HUDGINS &
                                    BORSOS, P.C.


                                    By: _____
                                         Sean P. Fitzgerald (P60654)
                                         Attorneys for Plaintiff
                                         40 Pearl Street NW, 5th Floor
                                         Grand Rapids, MI 49503